UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TIMJAE A. D'ALLO,<br><br>Plaintiff,<br><br>v.<br><br>STEPHANIE MODRIJAN, *et al.*,<br><br>Defendants. | CASE NO. 3:24-cv-05325-TMC<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

In this case, self-represented Plaintiff Timjae D'allo asserts claims under 42 U.S.C. § 1983 alleging that the Defendants ("Officers"), community corrections officers with the Washington Department of Corrections ("DOC"), violated his constitutional rights. Dkt. 10. Specifically, Mr. D'allo claims that Community Corrections Supervisor Stephanie Modrijan violated his due process rights by arresting him without probable cause, depriving him of his right to a fair hearing before imposing punitive measures, and enforcing unlawful probation conditions. *Id.* at 4. Mr. D'allo claims that Community Corrections Officers Cole Madison, Alberto Baena, Adam Peterson, and Shelby Lago used excessive force against him during his arrest. *Id.* Mr. D'allo also names Officer Vanessa Macbride in this lawsuit. *Id.* at 1.

The Officers moved for summary judgment based on qualified immunity for both claims. Dkt. 173 at 10, 24. The Officers also claim they are entitled to summary judgment on the excessive force claim because Mr. D'allo's testimony from his deposition does not provide a factual basis "from which a reasonable jury could conclude that Defendants' use of force was objectively unreasonable under the circumstances confronting them." *Id.* at 19.

For the reasons explained below, the Court GRANTS the motion on the due process claim. Even taking the facts in the light most favorable to Mr. D'allo, the evidence does not show that Officer Modrijan violated a clearly established right when she imposed short-term sanctions under DOC's "Swift and Certain" policy. The Court GRANTS the motion on the excessive force claim as to Officers Modrijan, MacBride, Peterson, and Lago because there is no evidence that they participated in the use of force. The Court DENIES the motion on the excessive force claim against Officers Baena and Madison. The Court finds that Mr. D'allo's version of events could establish a violation of clearly established law, which precludes summary judgment. The Court GRANTS Mr. D'allo's motion for appointment of counsel (Dkt. 199) for the remaining claim. As discussed further below, the Court will refer this case to the District's pro bono panel for appointment of counsel and enter a trial scheduling order once counsel is appointed.

## II. BACKGROUND

### A. April 2023 Incidents

In April 2023, Mr. D'allo was serving the community custody portion of a sentence for an earlier conviction. *See* Dkt. 174-1 at 24–33, 36–48. As part of his community custody sentence, Mr. D'allo was required to comply with several conditions including abstaining from using or possessing controlled substances, maintaining lawful employment, and following any conditions set by his community custody officer. *Id.* at 37–38. The court ordered that Mr. D'allo be subject to electronic monitoring as another condition. *Id.* at 38. At the time Mr. D'allo was

released from confinement, he was also provided a document relating to the Department's "Swift and Certain Sanctioning" policy. *Id.* at 40–41. Under that policy, he was advised that low level violations would be addressed using a stipulated agreement "or a short term confinement sanction of up to 3 days in custody, unless a hearing process is required due to aggravating circumstances." *Id.* at 40. He was also informed that "high level violations [would] be addressed through a hearing process, unless a mitigated response is approved per Department policy." *Id.* Mr. D'allo signed this document, underneath a statement saying that the signer understood the policy and consequences of violating the community custody conditions. *Id.* at 41. At the time of the challenged incidents, Officer Macbride supervised Mr. D'allo. Dkt. 176 ¶¶ 3–4.

On April 17, 2023, Mr. D'allo reported to the Tacoma Criminal Justice Center probation office where he was arrested for supposed community custody violations and told he would be placed on GPS (global positioning system) monitoring. *Id.*¶ 7; Dkt. 175 ¶¶ 6–8. Mr. D'allo alleges that "[o]n or about April 19," Officer Modrijan imposed restrictions on Mr. D'allo without court authority. Dkt. 10 at 3. He claims that his due process rights were violated when Officer Modrijan ordered his "detainment and confinement without notice for probable cause." *Id.* Mr. D'allo alleges that he "was incarcerated for allegedly refusing to comply with non-ratified and unlawful probation conditions," and "was also deprived of his constitutional right to question his accuser or even be … presented with a formal accusation before being detained." *Id.* He states that "[t]he arresting officers, acting under the direction of defendant Stephanie Modrijan, failed to present any legal documentation or a warrant that justified the plaintiff's detainment, raising serious concerns about the legality of their actions." *Id.* Mr. D'allo alleges that he was prohibited from possessing a body camera "without any means to document or contest such actions." *Id.* at 4. Officer Modrijan claims that she was not present during the encounter on April 17. Dkt. 175 ¶ 8. Although Mr. D'allo does not discuss Officer Macbride's

involvement in the April events in his complaint, she provided context for those encounters in her declaration, claiming that she was present during the encounter. Dkt. 176 ¶¶ 7–11. Officer Macbride testifies that Mr. D'allo became upset when told he needed to wear a GPS monitor and refused to sign the GPS monitor agreement. *Id.* ¶ 7. Mr. D'allo's alleged refusal was the reason for his subsequent arrest and three-day confinement under the Swift and Certain Sanctioning policy. Dkt. 175 ¶ 9–10; Dkt. 176 ¶ 9. According to Officer Modrijan, DOC attempted to increase Mr. D'allo's confinement length; however, the hearing officer declined the request. Dkt. 175 ¶¶ 11–14.

Officer Modrijan states that during Mr. D'allo's April 17 three-day custody, she discovered through monitored jail calls that Mr. D'allo was involved in an undisclosed romantic relationship, which violated a requirement to disclose romantic relationships with his community supervisor. *Id.* ¶¶ 16–18. Audio recordings of the calls contain Mr. D'allo referring to the female participant as "baby" and "my girl," discussing sex, and giving her instructions to communicate with others on his behalf. *See* Dkt. 178 (audio files). Officer Modrijan also states Mr. D'allo violated the prohibition on conference calling while in confinement, which is contained in the recordings as well. Dkt. 175 ¶ 19; Dkt. 178. Officer Modrijan then ordered a subsequent three-day confinement based on these violations during the initial three-day confinement. *Id.* ¶ 20. Once he was released from the second confinement, Mr. D'allo was fitted with a GPS monitor. *Id.* ¶ 24.

**B. November 2023 Incident**

The other incident relevant to Mr. D'allo's claims occurred on November 15, 2023. Dkt. 10 at 2. On that day, Mr. D'allo states that he reported to the probation office and completed a polygraph test. *Id.* After completing the test, Mr. D'allo claims he was surrounded by multiple officers, handcuffed, and informed he was being arrested because he was cited for working with

an unauthorized employer (DoorDash). *Id.* Mr. D'allo claims that when he tried to explain why the arrest was unjustified, he was "thrown to the ground" face first and that his face was cut by his glasses. *Id.* at 4. He asserts this act left physical (and emotional) scars. *Id.* at 2, 4. Mr. D'allo claims he asked for medical attention and needed to defend himself. *Id.* No video footage of the incident exists. Dkt. 159.

Officers involved in the November 15 arrest completed reports detailing their view of the arrest. Dkts. 174-4, 174-5, 174-6, 174-7, 174-8, 174-9. Officer Baena claims in his report that Officer Madison handcuffed Mr. D'allo. Dkt. 174-4 at 2. Officer Baena asserts that he escorted Mr. D'allo to an office where Officer Macbride informed Mr. D'allo why he was being arrested. *Id.* He claims that Mr. D'allo became "verbally aggressive" and was directed to stand up and leave the office. *Id.* As they were leaving the office, Officer Baena claims Mr. D'allo said, "The only way you are getting me out of here is with a fight, and it's on." *Id.* Officer Baena alleges that Mr. D'allo "planted his feet and began to forcibly resist by pushing back against [him] while using profanities." *Id.* Officer Baena claims,

> I then grabbed [Mr. D'allo's] elbow with my right hand and his right shoulder with my right hand and his right shoulder with my left hand and directed him to stop yelling, calm down, and walk towards to [sic] exit. He continued to push back against me, I then attempted to hold him against the wall to prevent him from pushing me against the other wall. As he continued to resist and refuse directives to stop pushing back, CCO Madison assisted me with placing him against the wall. I continue [sic] to give him directives to comply which he refused and began stomping his feet and kicking aggressively which made contact with my right foot. He was then escorted to the ground by CCO Madison and I assisted repositioning myself by placing by [sic] left hand on his left shoulder and right hand on his left forearm to prevent him from further injuring others or himself. He continued to resist physically until he was informed a wrap would be used. Which then stated he would comply.

*Id.* Officer Baena averred that Mr. D'allo was escorted to a transport vehicle and provided medical attention. *Id.* Officer Madison took a photograph of Mr. D'allo's injury after the incident. *Id.* at 3; Dkt. 174-1 at 49. Officer Baena stated that Mr. D'allo was taken to Tacoma

General Hospital first to be evaluated and cleared for booking at Nisqually Jail. Dkt. 174-4 at 2. Officer Baena claimed that Officers Witts, Peterson, Durrah, and Lago were also involved in the incident in addition to the other referenced officers. *Id.* at 3.

Officer Madison included a similar narrative of the incident in his report. Dkt. 174-5 at 2. Officer Madison also asserted that Mr. D'allo said that he "'never forgets a face and will not forget [Officer Madison's] once [I am] off in February.'" *Id.* Officer Madison reported that he asked Mr. D'allo if he was threatening the officer, to which Mr. D'allo repeated his comment. *Id.*

In Officer Lago's incident report, the officer denied being present during the arrest but arrived at the scene to see Mr. D'allo yelling at Officer Macbride and the subsequent incident involving the physical altercation between Mr. D'allo, Officer Baena, and Officer Madison. Dkt. 174-6 at 2. Officer Lago also asserted that Mr. D'allo continued to be verbally aggressive toward the present officers, but it is unclear from the report whether this claim was based on firsthand knowledge. *Id.*

Officer Peterson provided a similar narrative in his incident report. Dkt. 174-7 at 2. He reported that he assisted Officer Madison with handcuffing Mr. D'allo before escorting him to speak with Officer Macbride. *Id.* He also reported that he assisted with placing ankle restraints on Mr. D'allo after Officers Baena and Madison took him to the ground. *Id.* Officer Peterson stated he was present while Mr. D'allo was at Tacoma General. Dkt. 174-7 at 2. He claimed he heard the conversation between Mr. D'allo and Officer Madison about Mr. D'allo never forgetting a face. *Id.*

Officer Macbride claimed in her incident report that Officer Modrijan was not present during the events on November 15. Dkt. 174-8 at 2. She described that Officers Madison and Baena took Mr. D'allo to the ground, that his glasses were broken when they were "smashed

against his face during the take down," and that Mr. D'Allo had "a large cut and swollen area that was bleeding." *Id.*

Mr. D'allo's partner, Stephanie D'allo, who was sitting in the lobby of the probation office at the time of the arrest, testified that she could not hear anything (yelling, for example) until she heard a loud crash and, at one point, she heard Mr. D'allo yell, "baby, they're taking me to jail." Dkt. 174-3 at 11, 25–26; Dkt. 174-2 at 6. Stephanie also stated that she previously had sat in the lobby on numerous occasions and that she can usually hear conversations going on behind the wall and closed doors from the lobby. Dkt. 174-3 at 26.

At an administrative hearing on November 27, a hearing officer heard testimony from Mr. D'allo and Officers Baena, Madison, and Macbride. Dkt. 174-3. Three allegations were made against Mr. D'allo: (1) he was working for an unauthorized employer; (2) he failed to comply with officers' verbal directives during the arrest on November 15; and (3) he threatened a corrections officer on November 15. *Id.* at 7. Regarding the first allegation, Officer Macbride confirmed that Mr. D'allo had permission to drive his partner around while she picked up and delivered DoorDash and Uber Eats orders, and the hearing officer ultimately found there had been no violation. *Id.* at 19, 30.

With respect to the second and third allegations, Mr. D'allo denied resisting arrest and threatening Officer Madison on November 15, 2023. *Id.* at 7. Mr. D'allo testified that when he was taken to the ground, "[m]y feet was in the air, and he slammed me right on my face, broke my glasses." *Id.* at 14. "The first thing that hit the ground was my face. Nothing called for that. They never put me on the wall." *Id.* at 18. Mr. D'allo claimed that the officers' version of what happened was a lie and that they were working together to fabricate what happened during the arrest. *See, e.g.*, *id.* at 17, 22. Mr. D'allo denied threatening the officers. *Id.* at 14. Mr. D'allo asserted that he was not making threats to physically harm anyone, but rather, warning the

officers that he planned to sue them because of the purportedly unjustified arrest and resulting injuries. *Id.* at 24. Officer Madison recalled Mr. D'allo stating repeatedly that he doesn't make threats but instead was "very litigious." *Id.* at 23. Mr. D'allo also denied that the alleged de-escalation efforts occurred. *Id.* at 18. Stephanie testified that she had never heard Mr. D'allo threaten any officer. *Id.* at 26.

The hearing officer concluded that Mr. D'allo had not worked for an unauthorized employer. *Id.* at 30. The hearing officer found the officers' testimony to be credible regarding the second and third allegations against Mr. D'allo. *Id.* at 31–32. The hearing officer sanctioned Mr. D'allo to 13 days in jail. *Id.* at 40.

### C. Procedural History

On September 26, 2024, Mr. D'allo filed an amended complaint against Officers Modrijan, Macbride, Madison, Baena, Lago, and Peterson. Dkt. 10. He asserted a due process violation against all the defendants and an excessive force claim against Officers Madison, Baena, Peterson, and Lago. *Id.* at 4. He also asserted three other causes of action which were dismissed by the Court in November 2025. Dkt. 91. After nearly a year of discovery, the Officers moved to dismiss the remaining claims based on the pleadings, which the Court denied. Dkts. 94, 128. On June 9, 2026, the Officers moved for summary judgment based on qualified immunity for both claims. Dkt. 173. They also argued that because Mr. D'allo was unable to remember the underlying events of his complaint during his deposition, a jury could not find that the Officers used excessive force. *Id.* at 10, 19–24.

## III. JURISDICTION

The Court has federal question jurisdiction over this matter because Mr. D'allo's complaint contains claims that "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see* Dkt. 10 at 4 (alleging constitutional claims under 42 U.S.C. § 1983).

## IV. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). But "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in

favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

## V. DISCUSSION

### A. Summary judgment based on qualified immunity

The defense of qualified immunity protects "police officers from § 1983 liability unless (1) the officers 'violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time' of the violation." *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation modified)). Since "both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense," courts need not conduct an analysis on both prongs when a plaintiff fails to establish one prong. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

### B. Officer Modrijan is entitled to qualified immunity on the due process claim.

In its order denying Defendants' motion for judgment on the pleadings, the Court concluded that Mr. D'Allo's due process claim was alleged against Defendant Officer Modrijan. Dkt. 128 at 5. Officer Modrijan now claims that she is entitled to summary judgment on Mr. D'allo's due process claim based on qualified immunity. Dkt. 173 at 10–17. She asserts that Mr. D'allo cannot establish a due process violation nor show that her actions violated clearly established law. *Id.* at 12–18. Mr. D'allo claims that Officer Modrijan violated his due process rights "by imposing and enforcing unlawful probation conditions without judicial ratification, arresting the plaintiff without probable cause, and depriving him of his right to a fair hearing

before imposing punitive measures." Dkt. 10 at 4. He claims he was entitled to notice and an opportunity to be heard in line with the Supreme Court's decision in *Morrissey v. Brewer*, 408 U.S. 471 (1972). Dkt. 183 at 5.

An individual subject to community custody conditions is entitled to procedural safeguards when facing community custody revocation, but to a lesser extent than when facing criminal prosecution. *Standlee v. Rhay*, 557 F.2d 1303, 1307 (9th Cir. 1977) (citing *Morrissey*, 408 U.S. at 479, 489).[1] Under *Morrissey*, individuals subject to community custody revocation are entitled to:

> (a) written notice of the claimed violations; (b) disclosure of evidence against the petitioner; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses, unless the hearing officer specifically finds good cause for not allowing confrontation; (e) a "neutral and detached" hearing body; and (f) a written statement by the hearing officer as to the evidence relied upon and the reasons for revoking release.

*Silva v. Holbrook*, Case No. C16-0378-JCC, 2017 WL 568822, *8 (W.D. Wash. Feb. 12, 2017) (quoting *Morrissey*, 408 U.S. at 489).

In *Morrissey*, the petitioner was sentenced to up to seven years confinement but was paroled from full confinement the following year. 480 U.S. at 472. Seven months later, his parole officer arrested the petitioner for parole violations. *Id.* After a week in county jail, the parole board reviewed the petitioner's case and revoked his parole, thus returning the petitioner to the state penitentiary for an indeterminate amount of time. *Id.* at 472–73.

Here, on the other hand, Mr. D'allo was confined for three days each for the two alleged low-level violations in April 2023, in accordance with DOC's Swift and Certain policy.

---

[1] *Standlee* refers to parole rather than community custody. Community custody is analogous to parole and generally subject to the same procedural safeguards outlined in *Morrissey*. *See Silva v. Holbrook*, Case No. C16-0378-JCC, 2017 WL 568822, *8 (W.D. Wash. Feb. 12, 2017) (applying *Morrissey* requirements to community custody revocation).

*Morrissey* does not clearly establish that short custodial sanctions for low-level violations under the Swift and Certain policy violate an individual's due process rights. Furthermore, the *Morrissey* Court recognized that States have the responsibility to develop laws and procedures related to enforcing compliance with community custody conditions. *See id.* at 488; *Silva v. Andemariam*, Case No. C13-1182-JLR, 2014 WL 294528, * 2 (W.D. Wash. Jan. 27, 2014) (labeling the three-day confinement as a sanction and distinguishing it from the 19-day confinement resulting from the revocation hearing).

Mr. D'allo does not cite any other authority, nor has the Court found any, clearly establishing that the Swift and Certain policy—which obviates notice and a hearing for one- to three-day confinements under particular circumstances—violates an individual's due process rights. Because Mr. D'allo is unable to demonstrate the clearly established law prong required to overcome a qualified immunity defense, it is unnecessary to determine whether he established a constitutional violation. Officer Modrijan is entitled to qualified immunity on Mr. D'allo's due process claim.

**C. Officers Modrijan, MacBride, Lago, and Peterson are entitled to summary judgment because they did not participate in the use of force.**

The Officers argue that Mr. D'allo's excessive force claim fails because his declaration "does not identify which Defendant allegedly handcuffed Plaintiff, lifted Plaintiff, took Plaintiff to the ground, applied force, or otherwise personally participated in the alleged constitutional violation." Dkt. 187 at 7. Under § 1983, "each Government official is only liable for his or her own misconduct." *Peck v. Montoya*, 51 F.4th 877, 890 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)) (quotation modified). "It follows that liability may not be imposed based on a 'team effort' theory that would 'allow the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct.'" *Id.* (quoting

*Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996)). Here, even drawing all inferences in Mr. D'Allo's favor, the evidence supports only a conclusion that Officers Baena and Madison participated in the takedown that he contends was excessive. Because there is no evidence that Officers Modrijan, MacBride, Peterson, or Lago personally participated in the challenged use of force, the claim against them must be dismissed.

**D. Officers Baena and Madison are not entitled to summary judgment regarding Mr. D'allo's excessive force claim.**

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citation modified). Where factual disputes exist regarding the circumstances of the alleged excessive force incident, "summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (2007) (citation omitted).

*1. Mr. D'allo provided a factual basis to sustain an excessive force claim.*

First, the Officers claim that Mr. D'allo's testimony does not provide a factual basis from which a jury could find that the Officers used objectively unreasonable force and that the "undisputed record" doesn't support the excessive force claim. Dkt. 173 at 19–20. Relying only on Mr. D'allo's deposition transcript from March 24, 2026, the Officers claim that summary judgment is warranted because Mr. D'allo was unable to provide a detailed firsthand account of the alleged use of force. *Id.* at 19, 23 ("Plaintiff repeatedly testified that he does not remember many of the critical facts surrounding the November 15, 2023 incident") (citation omitted). The Officers' argument is unpersuasive because Mr. D'allo gave a detailed account of his version of

the November arrest during the administrative hearing 12 days after the incident. Dkt. 174-3. During that hearing, Mr. D'allo described being thrown to the ground with his feet in the air and slamming into the ground face-first, breaking his glasses. *See id.* at 14. This testimony must be considered along with the reports of Officers Madison and Baena, which acknowledge that they performed the takedown and that Mr. D'allo's injuries were sufficient to call EMS (emergency medical services) and take him to the hospital, *see* Dkt. 174-4 and 174-5, and the report of Officer Macbride, which similarly describes Mr. D'allo's glasses being "smashed against his face during the take down," and that Mr. D'allo had "a large cut and swollen area that was bleeding." Dkt. 174-8 at 2. Taken together, this evidence provides a sufficient factual basis for the jury to discern which officers were responsible for the use of force and what Mr. D'allo contends they did wrong.

2. *A reasonable jury could conclude that Officers Baena and Madison violated Mr. D'allo's Fourth Amendment right.*

Relying on the Officers' incident reports and Mr. D'allo's deposition where he lacked a detailed memory of the arrest, the Officers claim that Mr. D'allo does not present a viable Fourth Amendment violation claim. Dkt. 173 at 21–23.

Under the Fourth Amendment, individuals have a right to be free from unreasonable force during an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment applies to individuals subject to community custody who are arrested for violation of their conditions. *Smithson v. Hammond*, Case No. 3:22-cv-05029-TMC, 2023 WL 7110554, *8 (W.D. Wash. Oct. 27, 2023). In determining whether an excessive force claim overcomes a qualified immunity defense, courts must consider "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (2021) (internal quotation marks omitted). Courts balance the individual's interests in being

free from intrusion against the government's interests. *Id.* This balancing test includes considering (1) the type and amount of force inflicted; (2) the severity of the crime at issue; (3) whether the suspect posed an immediate threat to the safety of the officers or others; (4) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; and (5) availability of less intrusive alternatives to the force employed and whether proper warnings were given. *Id.* at 1121–22.

The fact pattern and *Graham* factor analysis from *Rice* are instructive to the instant case. In *Rice*, the police officers "executed the take-down maneuver while holding Rice." *Id.* at 1121. Viewing the incident in a light most favorable to Rice, the Ninth Circuit agreed with the district court's characterization that a "substantial" and "aggressive" amount of force was used. *Id.* (quotation modified). The court then considered whether the amount of force used during the encounter with Rice was justified under the circumstances. *Id.*

In that case, a police officer had pulled Rice over for failure to use his turn signal before changing lanes while he was driving with his wife and two daughters at 3:30 A.M. *Id.* at 1116. Rice showed the officer his license through the window but declined to provide proof of car registration and insurance. *Id.* The officer called for backup and repeated her request for the documents. *Id.* Rice declined again. *Id.* The officer then informed Rice that he was under arrest and directed him to exit the vehicle. *Id.* Rice declined. *Id.* When additional officers arrived at the scene, Rice again refused directions to exit his car. *Id.* The officers forcibly pulled Rice from the car and threw him to the ground face-first. *Id.* Rice repeatedly asked the officers why they were using force on him. *Id.*

In weighing the State's interest in using force, the *Rice* court reasoned that the officer did not appear to view the situation as an emergency because she told the other officers she just needed help getting Rice out of his car. *Id.* at 1122–24. The purported traffic offense was minor.

*Id*. Next, the court noted that the officers likely did not consider Rice to be a threat because prior to the other officers' arrival, the first officer turned her back on Rice and re-approached without obvious concern for her safety. *Id.* Under the fourth factor, an officer's dash-cam showed that Rice was calmly speaking with another officer. *Id*. Despite the parties' conflicting evidence, the court credited Rice's version of the incident where he claimed that he was not actively resisting. *Id*. Finally, the court reasoned that the State had little interest, given the circumstances, in abandoning the initial plan to arrest Rice while he was standing up. *Id*. Based on its analysis, the *Rice* court concluded that "a reasonable jury could find that the state's minimal interest in the use of force against Rice did not justify the 'substantial force' used against him." *Id.* at 1124.

The officers here used a similar take-down maneuver on Mr. D'allo on November 15, 2023, and the *Graham* factor analysis is comparable. First, Mr. D'allo's description of the takedown, his undisputed injuries, and the fact he was taken to the hospital support an inference that the takedown was "substantial" and "aggressive," as in *Rice. See id.* at 1121. Second, the purported community custody violation—working for an unauthorized employer—was a low-level violation. *See* Dkt. 174-3 at 8. Third, Mr. D'allo was already in handcuffs and surrounded by three to five officers inside the probation office. *See, e.g.,* Dkt. 174-8 at 2. Mr. D'allo's partner, who was in the lobby, states that she did not hear any yelling until after she heard a loud crash. Dkt. 174-3 at 25–26. Viewing the sequence of events in the light most favorable to Mr. D'allo, any threat of harm posed by him was minimal. Fourth, based on Mr. D'allo's previous testimony, the Court must assume that he did not actively resist or evade arrest and credit his claim that the Officers did not engage in their reported de-escalation efforts. *See, e.g.*, Dkt. 10 at 4; Dkt. 174-3 at 7, 18. A reasonable jury could find that the force used was excessive.

*3. Mr. D'allo's right to be free from substantial force on November 15, 2023, was clearly established.*

Relying, again, on their version of the incident, the Officers claim that no authority clearly established that their conduct would violate an individual's Fourth Amendment right. Dkt. 173 at 24–25. "For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117. The Ninth Circuit's opinion in *Rice* is also dispositive here. First, *Rice* was decided in 2021, and it is sufficiently analogous to place the officers on notice that an aggressive takedown of someone who was alleged to have committed a minor community-custody violation, was already in handcuffs and surrounded by officers, presented no threat, and was engaged in, at most, passive resistance would violate the Fourth Amendment. *See* 989 F.3d at 1124. Second, *Rice* found that these principles were also clearly established by earlier cases recognizing one's "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). Viewing the facts in the light most favorable to Mr. D'allo, existing Ninth Circuit precedent clearly established that the use of substantial force in his arrest was excessive, and Officers Baena and Madison are not entitled to qualified immunity.

## VI. APPOINTMENT OF COUNSEL

At oral argument on the summary judgment motions, the Court told Mr. D'allo that if his claims proceeded to trial, the Court would make every effort to appoint counsel for him. Mr. D'allo then filed a motion to appoint counsel. Dkt. 199. In his motion, Mr. D'allo writes that it is much more difficult for him to express his position when speaking than in writing, and that while he has litigated the case on his own to this point, "a trial is a fundamentally different undertaking," and

he does not feel that he can respond to objections, examine witnesses, or apply the rules of evidence in real time, without the opportunity to pause and research. *See id.* at 2. Although the Court has denied Mr. D'allo's previous motions for appointment of counsel, *see* Dkts. 15, 50, 91, it now finds that by defeating summary judgment, he has shown a reasonable likelihood of success on the merits, and that because this case will turn heavily at trial "on credibility determinations and cross-examination skills," the complexity of the case also weighs in favor of appointment. *Ewalan v. Wash. Dept. of Corrections*, No. 24-2918, Slip Op. at 13–18 (9th Cir. Nov. 24, 2026). The Court therefore GRANTS Mr. D'allo's motion for appointment of counsel (Dkt. 199) and will direct the District's Pro Bono Coordinator to identify qualified counsel from the Court's pro bono panel.

## VII. CONCLUSION

For the reasons explained above, the Court ORDERS:

1. Defendants' motion for summary judgment (Dkt. 173) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff's due process claim against Defendant Officer Modrijan is DISMISSED WITH PREJUDICE.

3. Plaintiff's excessive force claims against Defendants Officers Modrijan, MacBride, Lago, and Peterson are DISMISSED WITH PREJUDICE. The Clerk is directed to terminate these four defendants from the case.

4. The motion to dismiss the excessive force claims against Officers Baena and Madison is DENIED, and these claims will proceed to trial.

5. The Clerk is directed to amend the caption so that, when the case proceeds to trial, it reflects only Officers Baena and Madison as defendants.

6. Plaintiff's motion for appointment of counsel (Dkt. 199) is GRANTED. The Court will send a copy of this Order to the District's pro bono coordinator and directs the pro bono coordinator to appoint qualified trial counsel from the panel.

7. After counsel is appointed, the Court will schedule a status conference to set a schedule for trial and the remaining pretrial deadlines. The Court will also require the parties to attend a settlement conference with a Magistrate Judge.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 25th day of November, 2026.

Tiffany M. Cartwright
United States District Judge